ORIGINAL

CHRISTOPHER A. CROFTS
United States Attorney
STEVEN K. SHARPE
Assistant United States Attorney
P.O. Box 668
Cheyenne, WY 82003-0668
Telephone: 307-772-2124
Facsimile: 307-772-2123

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

NOV 30 2010

Stephan Harris, Clerk
Cheyenne

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No: 10-CV-259-J |
| ) | |
| **$131,206.00 IN UNITED STATES CURRENCY,** ) | |
| ) | |
| Defendant. ) | |

### VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, United States of America, by its attorneys, Christopher A. Crofts, United States Attorney for the District of Wyoming, and Steven K. Sharpe, Assistant U.S. Attorney, pursuant to Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions G(2), states:

### JURISDICTION AND VENUE

1.  The United States of America has commenced this action for forfeiture pursuant to 21 U.S.C. §881(a)(6) for violations of 21 U.S.C. §841(a)(1); as well pursuant to 18 U.S.C. §981(a)(1)(A) for violations of the money laundering provisions of 18 U.S.C. §1956(h) and 18 U.S.C. §1956(a)(1)(B)(i). This Court has jurisdiction under 28 U.S.C. §§ 1345 and 1355.

2.      Venue is proper in this district pursuant to 28 U.S.C. §1355(b)(1) because some of the acts or omissions giving rise to the forfeiture occurred in this district, and pursuant to 28 U.S.C. § 1395 because the property is located and found in this district.

### THE DEFENDANT PROPERTY

3.      The "Defendant property" is $131,206.00 in United States Currency which was seized from Dominic Paul MAIANI on May 6, 2010, during a traffic stop on Interstate I-80 in Sweetwater County in the District of Wyoming. It is presently in the custody of the United States Marshals Office Seized Asset Fund and under the direction and control of the United States Marshal's Office for the District of Wyoming.

### FACTUAL BASIS FOR FORFEITURE

4.      On May 6, 2010, Wyoming Highway Patrol Trooper Jason Green received a complaint of a black Ford Focus that had previously passed another vehicle traveling over 100 miles per hour. The complainant went on to say the black Ford Focus was now parked on the side of the interstate and it appeared there was no one in the vehicle. Trooper Green responded to the call and found the black Ford Focus at approximately mile post 161 in Sweetwater County, Wyoming parked on the east bound shoulder of I-80. Trooper Green approached the vehicle and saw that the only person in the car was the driver and he appeared to be asleep behind the wheel. Trooper Green woke the driver and inquired about his physical condition and trip itinerary. The driver was slow to wake

and appeared to be disoriented. The driver responded that he was fine, but that he had taken a nap and did not realize what time it was.

5. Trooper Green asked the driver for his license, and the driver produced a Michigan driver's license in the name of Dominic Paul MAIANI. Trooper Green asked MAIANI where he was coming from and MAIANI stated he had been in San Jose, California and had driven for several hours straight. Trooper Green then asked for the vehicle's paperwork and MAIANI produced a one-way car rental agreement from San Jose, California, to Denver, Colorado. After receiving these documents, Trooper Green asked MAIANI to accompany him to his patrol car.

6. Once in the patrol car, Trooper Green again asked MAIANI about his travels. MAIANI stated he had flown to San Jose the previous day. He had only spent one day in San Jose and was now driving back to Denver. Trooper Green asked MAIANI what had taken him to San Jose. MAIANI said he went to visit some buddies. Trooper Green asked why it was such a short trip and MAIANI responded that they also did a little business while he was there. When asked what type of business, MAIANI responded that it was a cash for gold business where people exchange their gold for cash. MAIANI went on to say his buddy's dad started the cash for gold business in Michigan. His friend told him how profitable it was so MAIANI wanted to go into the business.

7. Trooper Green then explained to MAIANI the traffic complaint he received and told him that it was illegal to park on the highway. Trooper Green finished writing his warning and contact sheet and asked MAIANI if he had any questions. MAIANI said he did not. Trooper Green

returned MAIANI'S documents and handed him his warning. Trooper Green asked MAIANI if he had any drugs in this vehicle, and MAIANI replied that he did not. Trooper Green asked if he could search MAIANI's vehicle and MAIANI consented. Trooper Green asked a second time if MAIANI minded if he searched the car and MAIANI said it was okay.

8. Trooper Green conducted a search of the Ford Focus and found in the trunk a backpack with gold trinkets, and a small locked safe. Trooper Green asked what was in the safe and MAIANI responded that it was "just money and gold for our gold party cause that's what we do." Trooper Green asked if he could look inside the safe but MAIANI said he did not have the code to open the safe. He told Trooper Green he did not own it, his buddy did. Trooper Green told MAIANI he was going to deploy his drug dog. Trooper Green deployed his dog, Kato, around the car. Kato sniffed at the safe and alerted, indicating to Trooper Green that the dog had detected the odor of one of four controlled substances he was trained to detect. Trooper Green deployed the dog a second time, and Kato again sniffed at the safe and again gave an alert by sitting down.

9. Trooper Green asked MAIANI who he could call to obtain the combination to the safe. MAIANI said the safe was his friend "Mike's." Trooper Green asked why MAIANI had his friend's safe. MAIANI stated it was because he was going to do the business in Denver. Trooper Green then asked why MAIANI did not have the safe's combination if he was going to do this in Denver. MAIANI replied that his friend "Mike" was going to come to Denver to show him how to do the gold parties, and that "Mike" would give him the combination then. Trooper Green

explained to MAIANI that the dog alerted to the safe indicating there may be drugs in the safe. MAIANI said there were no drugs in the safe. Trooper Green said that unless MAIANI was able to get the combination to the safe, a locksmith would have to drill it open and the safe would be destroyed in the process. Trooper Green gave MAIANI's phone back to him to see if he could contact his friend to obtain the safe's combination. MAIANI sent several text messages and then told Trooper Green it was fine to destroy the safe to get it opened. MAIANI said there was only cash in it, but did not know the exact amount. He estimated there was between $75,000 to $100,000 in the safe. Trooper Green placed the safe in his patrol vehicle and transported the safe to the Wyoming Highway Patrol office in Rawlins and contacted Wyoming DCI for assistance. MAIANI agreed to follow Trooper Green to Rawlins.

10. Once at the Highway Patrol office, Trooper Green read MAIANI his *Miranda* rights and MAIANI agreed to talk to Trooper Green. MAIANI stated that the cash in the safe was for his gold business and that he been doing this for over a year. This information conflicted with MAIANI's story that he had went to San Jose to learn the business. MAIANI also changed his story about the money belonging to his friend, and was now claiming the money was his as well. Trooper Green then asked him, if the money was his as well, why did he not know the combination to open the safe.

11. The locksmith arrived and opened the safe which contained the Defendant $131,206.00 in United States Currency. There was no gold in the safe.

12. Special Agents Nick Bisceglia and Eric Ford of the Wyoming Division of Criminal Investigation (DCI) responded to the Wyoming Highway Patrol office in Rawlins to interview MAIANI. Before being interviewed by the special agents, MAIANI stated he wanted to keep the safe with him or he would not talk to the agents. SA Bisceglia and SA Ford allowed MAIANI to carry his safe to the conference room where MAIANI agreed to be interviewed. After reading MAIANI his constitutional rights, SA Bisceglia asked MAIANI if he wanted his lawyer present. MAIANI said he did not want his lawyer present and would speak to the agents.

13. MAIANI stated substantially the following: MAIANI told the agents he was originally from Detroit, Michigan but now lived in Denver, Colorado. MAIANI did "cash for gold" for a living. A friend of MAIANI's father had started the cash for gold business. MAIANI held gold parties where people were invited to bring their old gold to the party. MAIANI would purchase the gold for cash and make a profit. By hosting a party, MAIANI would make ten (10%) percent of the total profit.

14. MAIANI flew from Denver, Colorado to San Jose, California on Frontier Airlines but no longer had the airline ticket and could not remember the flight number. MAIANI rented the Ford Focus in San Jose. He attempted to use a friend's credit card but it had been declined so he paid for the car rental himself. MAIANI flew to San Jose because that was where they did their gold parties and he wanted to hear how to start his parties in Colorado.

15. MAIANI stated he arrived in San Jose and rented the car at approximately 11:30 am, and that he then drove to his friend's house for the gold party. He did not know where the house was nor the address. He arrived at approximately 12:30 or 1:00 pm. The party lasted about two or three hours and MAIANI then left San Jose and began his trip back to Denver.

16. SA Bisceglia asked where the money originated and who owned the money. MAIANI answered: "It's my buddy's dad's, here's the thing, when we buy all this gold we send it to a refinery, so we buy it from you for cheap prices and then we send it to a refinery, and the refinery sends us ninety-five percent (95%) and they take three percent (3 %) so we make a shit load, pretty much." SA Bisceglia again asked whose money was in the safe. MAIANI answered: "It's my money to use to buy gold." SA Bisceglia clarified, "But you were saying this was your friend's dad's money." MAIANI stated, "No, that's where the whole company started."

17. SA Bisceglia asked MAIANI a third time where the money had originated from. MAIANI answered differently again, stating: "From all those guys, from selling it, and buying gold. From sending it to the refinery and the refinery sends them a check, so then they just cash it and then whatever." MAIANI stated that there was not one owner of the money, and that he was in possession of the money to start his "cash for gold" business in Denver, Colorado. MAIANI looked at SA Bisceglia's watch, stated it looked like a nice watch and offered to purchase the watch right then. SA Bisceglia was wearing a silver watch at the time of the interview.

18.     SA Bisceglia stated that MAIANI should know how much money was in the safe, since he was going to use the money to start his business. However, MAIANI had no idea how much money was in the safe and did not know the code to open it. MAIANI stated that his buddy was going to "come out and do all the stuff because he didn't want anybody to touch the cash." MAIANI went on to state that the money was not MAIANI's but belonged to his buddy, who was going to fly to Denver after MAIANI had booked three parties. MAIANI's buddy would show MAIANI how to produce a gold party. MAIANI's buddy was not identified by name.

19.     SA Bisceglia asked MAIANI why his business did not use wire transfers for the large amounts of cash. MAIANI answered, "Because we pay cash, because I was out there so that I was just bringing it back with me because I don't like flying anyway, I hate flying." MAIANI stated he did not own a car.

20.     SA Bisceglia left the room and SA Ford and MAIANI were left alone in the conference room. MAIANI asked SA Ford what he thought of the situation. SA Ford advised MAIANI that he would remain impartial. MAIANI reached into the safe and removed two bundles of cash, placing one on the money clip of his wallet and the other in his pants pocket.

21.     MAIANI looked at SA Ford, holding a bundle of five dollar bills wrapped in a band that indicated there was a total of five hundred dollars ($500.00) in the bundle, and tapped the bills on the table for a minute. MAIANI then held the bills toward SA Ford and quietly asked "You want

some?" SA Ford replied, "No, not me, that's not my money." MAIANI replied, "I'll teach you how to do it." SA Ford told MAIANI, "No way, that's not my money."

22. SA Bisceglia returned to the conference room and advised MAIANI that since there was no documentation for the money and the dog alerted to the presence of controlled substances, the currency was being seized. The cash that had been removed from the safe by MAIANI was returned to the safe by SA Bisceglia. MAIANI wanted to argue that he only removed one bundle of money, but SA Ford had watched him remove two.

23. On September 7, 2010, a Petition for Remission and Notice of Contest of the cash seizure was filed by Fadi KHALIFE in an administrative forfeiture action brought by the DEA. In his Petition, KHALIFE stated that he is the principal owner of Gold Corp., Inc. with its home office located in Oak Park, Michigan. KHALIFE claimed to be the rightful owner of the Defendant property, $131,206.00 in United States Currency. KHALIFE stated, under penalty of perjury, that his business "regularly sends bulk gold, in the form of gold bars and individual pieces of jewelry, to the State of California for processing and/or sales." According to KHALIFE, MAIANI was a "contractor" for Gold Corp and that Gold Corp. used MAIANI's "transportation services to transport the herein monies (and a small quantity of bulk gold) from the State of California to the State of Michigan."

24. The statements made by KHALIFE' in his Petition are considerably different from the various stories MAIANI gave to law enforcement. For example, KHALIFE claimed in his Petition

that the money was being transported by MAIANI back to Michigan on behalf of Gold Corp., whereas MAIANI stated that he was taking the money to Denver to start his own business. Moreover, MAIANI never mentioned or stated to law enforcement that he worked for Gold Corp., or that KHALIFE or Gold Corp owned the cash found in the safe he was transporting.

25. Upon information and belief, Petitioner Fadi KHALIFE was previously convicted in the mid-1990's in United States District Court for the Eastern District of Michigan of money laundering, aiding and abetting, and conspiracy to avoid cash transaction reporting requirements, and was sentenced to 46 months of imprisonment, followed by 2 years of supervised release and was ordered to pay confinement costs of $1,779.33 and $200 in special assessment fees.

26. Upon information and belief, it is alleged that KHALIFE has used his gold business (Gold Corp. Inc.) as a front to launder drug proceeds. The facts underlying KHALIFE's felony money laundering convictions from the Eastern District of Michigan involved, upon information and belief, KHALIFE's receipt of money in exchange for gold or jewelry from an undercover law enforcement officer, which money was represented to KHALIFE by the undercover agent to be money from cocaine trafficking.

**FIRST CLAIM FOR RELIEF**

27. The Plaintiff repeats and incorporates by reference the paragraphs above.

28. By the foregoing and other acts, Defendant $131,206.00 in United States Currency is subject to forfeiture pursuant to 21 U.S.C. §881(a)(6) because it constitutes: 1) money, negotiable

instruments, securities and other things of value furnished and intended to be furnished in exchange for a controlled substance, 2) proceeds traceable to such an exchange, or 3) money, negotiable instruments, and securities used and intended to be used to facilitate a violation of the Controlled Substances Act.

## SECOND CLAIM FOR RELIEF

29.  The Plaintiff repeats and incorporates by reference the paragraphs above.

30.  By the foregoing and other acts, Defendant $131,206.00 in United States Currency is subject to forfeiture pursuant to 18 U.S.C. §981(a)(1)(A) as it constitutes property involved in a transaction or attempted transaction in violation of 18 U.S.C. §1956.

**WHEREFORE,** the United States prays for entry of a final order of forfeiture for the defendant properties in favor of the United States, that the United States be authorized to dispose of the defendant property in accordance with the law, that the Court enter a finding of probable cause for seizure of the Defendant property and issue a Certificate of Reasonable Cause pursuant to 28 U.S.C. §2465 and for such other and further relief as the Court deems proper and just.

**DATED** this 30th day of November, 2010.

CHRISTOPHER A. CROFTS
United States Attorney

By: _____
STEVEN K. SHARPE
Assistant United States Attorney

## VERIFICATION

STATE OF WYOMING   )
                   ) ss.
COUNTY OF LARAMIE  )

I, Special Agent Brian Mix, of the United States Drug Enforcement Administration (DEA) Resident Agent Office in Cheyenne, Wyoming, hereby state and aver that I have read the foregoing Factual Basis for Forfeiture in this Verified Complaint and that the matters contained therein are true to my own knowledge, except that those matters herein stated to be alleged on information and belief, and as to those matters I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the reports and information supplied to me by other law enforcement officers, as well as my investigation of the case, together with others as a Special Agent of the DEA.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

_____
Brian Mix
Special Agent DEA

The foregoing instrument was acknowledged before me by Brian Mix this 30th day of November, 2010.

**WITNESS** my hand and official seal.

_____
Notary Public

MY COMMISSION EXPIRES:

4-3-2012

-12-